UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DARYL M. HILL, | ) | CASE NO.4:24CV1628 |
| | ) | |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | OPINION AND ORDER |
| CHECKR, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## CHRISTOPHER A. BOYKO, J:

This matter is before the Court on Defendant Checkr, Inc.'s Motion to Compel Arbitration and Stay Proceedings. (ECF # 10). For the following reasons, the Court grants the Motion, stays the case and Orders the parties to arbitration in accordance with their agreement.

### Background Facts

This case was removed from Mahoning County Court on September 23, 2024. According to Plaintiff Daryl M. Hill's ("Hill") Complaint, Defendant Checkr, Inc. ("Checkr") provides background screening and checks for employers. Hill is a commercial Truck Driver and applied for a position with Lyft in January of 2024 to earn extra money on weekends. Hill had previously worked for Boyko Trucking[1] at the end of 2023 but left the position after two months due to the open hostility of Boyko's owner. Lyft reported to Hill that the background check was

---

[1] No relation to the Court.

taking longer than usual. Subsequently, Hill was denied employment with Lyft because Checkr erroneously reported to Lyft that Hill was a convicted rapist and sex offender who had served a substantial prison term. However, Hill has never been convicted of a crime and the Checkr report confused him with a convict out of Erie County with a similar name. This was in spite of the fact that the information provided by Hill clearly indicated his middle name is Maurice while the convicted rapist had no middle name. Moreover, Hill is a black male while the convict is white. Hill believes this gross error on the part of Checkr cost him the Lyft position and was the cause of the hostility at Boyko Trucking as well as costing him employment opportunities for other positions he applied for that contained the erroneous criminal background information. Hill alleges a claim for violation of the Fair Credit Reporting Act ("FCRA").

Checkr provides services, including preparing consumer reports for employment purposes such as background check reports. Checkr prepared a background check for Boyko Trucking, LLC on or about October 18, 2023 and for Lyft, Inc. on or about January 17, 2024.

Checkr moves to compel arbitration contending that as part of the registration with Checkr for a background check, Hill agreed to a binding arbitration agreement contained in the Checkr website's Terms of Service ("TOS"). This same arbitration agreement has been upheld as enforceable by numerous courts throughout the country.

According to Checkr, the arbitration agreement delegates all questions of arbitrability to an arbitrator. Consequently, the Court's only role is to determine whether the parties agreed to arbitrate their disputes. However, even if the Court concludes it has the authority to determine if the issues raised in the Complaint are arbitrable, the Court should find they fall squarely within the scope of the arbitration agreement.

Checkr asserts it performed a background check on Hill for Boyko Trucking, LLC on October 18, 2023 and for Lyft Inc on January 17, 2024. On September 26, 2023, Hill accessed Checkr's online Candidate Portal, which allowed Hill to view his background check report's status. Before accessing his background check progress, Hill first had to agree to Checkr's TOS regarding the use of the Candidate Portal. Checkr asserts that Hill electronically agreed to the TOS by clicking a box next to "By checking this box, I agree to Checkr's Terms of Service." The TOS govern all aspects of a person's access and use of Checkr's Services found in its Candidate Portal.

The TOS include an arbitration agreement that required all questions of arbitrability be referred to the arbitrator and contained a provision giving any party thirty days to opt out of the arbitration agreement by sending an email to Checkr. Hill did submit an opt-out email to Checkr on February 20, 2024, but it was four months after the thirty day opt out period had expired. Thus, Checkr contends, Hill is bound by the arbitration clause. Therefore, Checkr seeks to compel Hill to arbitrate his claims.

**Hill's Response**

Hill argues that he never saw, read or signed the arbitration agreement with Checkr. In 2023, Hill used his cell phone to apply for trucking jobs. While he does not recall the date he made these applications, he does not dispute Checkr's representation that it was on September 26, 2023. However, Hill is certain that he never saw any document labeled "Term of Service," never saw a document with the name "Checkr," and never clicked on any agreement related to a Terms of Service. Likewise, he never saw any document with the words "Terms of Service" when again, he used his cell phone in January of 2024 to apply for a position with Lyft, Inc. Nor

3

did he agree to arbitrate any disputes over the application. In his Complaint, he alleges he signed documents authorizing Boyko and Lyft to obtain background checks on him. He agrees that he provided his first, middle and last names, his date of birth, address and social security number with his application. He uploaded a photo driver's license demonstrating he is a black male. He was unaware that Checkr had a role in the application process and he never intended to do any business with Checkr.

On February 2, 2024, Hill received a text message from Lyft declining his employment application due to an alleged felony conviction for rape for which he purportedly served a ten-year prison sentence. Hill, upon reading this, went into a panic and immediately responded that he had never raped anyone, had never been convicted of such a crime and never served any time in prison. After contacting an attorney and after some investigation, Hill learned that the information was provided by Checkr to Lyft and that the error was due to confusion with an convicted felon who shared Hill's first and last name.

Hill argues that it is for the Court to determine whether there is an enforceable agreement to arbitrate and a court cannot compel arbitration if there is any genuine issue of fact concerning the agreement's formation. Hill attests in an attached declaration that he did not agree to arbitrate, that he never saw the TOS containing the arbitration agreement and never agreed to the TOS.

In addition, Hill contends Checkr is a "stranger" to the transaction between Hill and the companies he sought to do business with -i.e. Boyko Trucking and Lyft. As such, Checkr had to conspicuously notify Hill of its role and yet an examination of the screen captures from its web site demonstrate Checkr failed to do so.

4

Hill asserts the arbitration agreement is procedurally unconscionable because it purports to extend any agreement to arbitrate in perpetuity. Here, even if Hill had agreed to arbitrate any disputes arising from his 2023 application with Boyko, it cannot be used to compel him to arbitrate an entirely separate application he made in 2024 with Lyft.

Lastly, Hill asserts that the arbitration agreement is substantively unconscionable again because it seeks to bind Hill to arbitrate all disputes no matter how unrelated to his original application for employment with Boyko and there was no mutual assent.

## LAW AND ANALYSIS

### Standard of Review

The Federal Arbitration Act ("FAA") provides that an arbitration clause in a "transaction involving commerce ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA further mandates that when the Court is "satisfied that the making of the agreement for arbitration ... is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4.

The FAA establishes a liberal policy favoring arbitration agreements, and any doubts regarding arbitrability should be resolved in favor of arbitration over litigation. See *Fazio v. Lehman Bros., Inc.*, 340 F.3d 386, 392 (6th Cir. 2003). "A central purpose of the FAA is 'to reverse the longstanding judicial hostility to arbitration agreements ... and to place arbitration agreements upon the same footing as other contracts.'" *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991). The FAA requires courts to "rigorously enforce" arbitration agreements. *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985). Yet, arbitration clauses are

5

subject to the same defenses or bars as other contract provisions. 9 U.S.C. § 4. The Court must ascertain whether the parties agreed to arbitrate the dispute at issue. See *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985). A party cannot be required to arbitrate any dispute if the party has not agreed to do so. *Steelworkers v. Warrior & Gulf Co.*, 363 U.S. 574, 582 (1960). The FAA does not confer an absolute right to compel arbitration, but only a right to obtain an order directing that "arbitration proceed in the manner provided for in [the parties'] agreement." *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University*, 489 U.S. 468, 469 (1989). The "party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Financial Corp.- Alabama v. Randolph*, 531 U.S. 79, 91 (2000); *Gilmer*, 500 U.S. at 26. To meet this burden, "the party opposing arbitration must show a genuine issue of material fact as to the validity of the agreement to arbitrate, a showing that mirrors the summary judgment standard." *Great Earth Cos. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002). "[M]ere conclusory and unsupported allegations, rooted in speculation, do not meet that burden." *Bell v. Ohio State Univ.*, 351 F.3d 240, 253 (6th Cir. 2003) (citation omitted).

In determining whether to grant motions to compel arbitration, courts must apply a four-pronged test: (1) whether the parties agreed to arbitrate; (2) the scope of that agreement; (3) if federal statutory claims are asserted, whether Congress intended those claims to be arbitrated; and (4) whether to stay the remainder of the proceedings pending arbitration. *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000). Accordingly, a court reviews "the enforceability of an arbitration agreement according to the applicable state law of contract formation." *Seawright, v. American General Financial Service, Inc.,* 507 F.3d 967, 972 (6th Cir. 2007); see also

*Tillman v. Macy's, Inc.,* 735 F.3d 453, 462 (6th Cir. 2013).

In their briefing, both parties rely on Ohio law. In Ohio, "[a] contract is generally defined as a promise, or a set of promises, actionable upon breach. Essential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration." *Rayess v. Educ. Comm'n for Foreign Med. Graduates*, 983 N.E.2d 1267, 1271 (2012) (quoting *Kostelnik v. Helper*, 770 N.E.2d 58, 61 (2002)). "Mutual assent 'ordinarily takes the form of an offer or proposal by one party followed by an acceptance by the other party or parties.' " *Reulbach v. Life Time Fitness, Inc.*, No. 1:21 CV 1013, 2021 WL 2581565, at *4 (N.D. Ohio June 23, 2021) quoting *Dantz v. Am. Apple Grp., LLC,* 123 Fed. Appx. 702, 707 (6th Cir. 2005). Like Federal law, Ohio law favors the arbitration of disputes. *Williams v. Aetna Fin. Co.*, 83 Ohio St.3d 464, 471 (1998).

"The Supreme Court has repeatedly held that contracts to arbitrate federal statutory claims are enforceable unless 'Congress has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue.'" *Green Tree Fin. Corp*., 531 U.S. at 90. Moreover, the United States Supreme Court has consistently held that arbitrators are more than capable of preserving and enforcing statutory rights and that arbitration forums are well suited to hear and adjudicate statutory claims. See *Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 122-23 (2001); *Green Tree Fin. Corp*., 531 U.S. at 90; *Gilmer*, 500 U.S. at 35.

The Sixth Circuit has held that when a court considers matters outside the pleadings to determine whether an enforceable arbitration clause between the parties exists, the court should apply the summary judgment standard. See *Boykin v. Family Dollar Stores of Michigan*, 3 F.4th

7

832, 838 (6th Cir. 2021). Checkr attaches to its Motion a copy of the TOS Agreement with Hill's electronic signature. Therefore, to establish a "genuine" dispute over whether he accepted the contract pursuant to Fed.R.Civ.P. 56(a), Hill needs to present "specific facts, as opposed to general allegations," that would allow a reasonable trier of fact to find that he did not acknowledge the TOS or agree to arbitrate. See *Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020) ("Just as a plaintiff may not rely on conclusory allegations to proceed past the pleading stage, so too a plaintiff may not rely on conclusory evidence to proceed past the summary-judgment stage.") (internal citations omitted). "Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment." *Alexander v. CareSource,* 576 F.3d 551, 560 (6th Cir. 2009)

**Agreed to Arbitrate**

In his Declaration, Hill attests: "In accessing the various trucking websites in the fall of 2023, with my cell phone I never saw any document labelled as "Terms of Service" nor did I ever see the name "Checkr" during the employment application processes. On the screen of my phone, I did not click on any agreement related to "Terms of Service" and at that time did not believe I was agreeing to anything other than making applications for truck driving postiions." (ECF # 12-1 pg 2). Hill further attests that he did not agree to arbitration, did not see anything regarding "Checkr" and never agreed to Checkr's Terms of Service when he applied for a position with Lyft in January 2024 (*Id.*).

Hill attests he provided his name, date of birth, social security number, address and a copy of his drivers licence when he applied for the Lyft position. (*Id*).

In contrast, Checkr provides the declaration of Jamie Fong, Senior Product Operations

Specialist.  Fong attests to having personal knowledge of Hill's file with Checkr.  Fong attests that on September 26, 2023, Hill accessed the online Candidate Portal.  Before he could access the Candidate Portal, Hill had to provide his personal identifying information, including his Social Security number and date of birth.  (ECF #10-1 pg 3).  Checkr then confirms the person's personal identifiers match those of a person for whom they have completed a background check.  Once it confirms the person's identity, Checkr requires that a person agree to its Terms of Service before it can access the Candidate Portal for the first time.  Moreover, Fong attests that a person cannot access the online Candidate Portal without first agreeing to Checkr's "Terms of Service." (*Id*).  According to Fong, users of the Candidate Portal have access to certain services provided by Checkr.  These services "include obtaining, delivering, and managing background reports and related documentation; obtaining status information regarding background reports; Checkr's processes for generating background reports and resolving potential inaccuracies; requesting a copy of a consumer file; and any disputes relating to a background check." (*Id* at 4).  However, to access them online a user must agree to the TOS.  Fong attests that "users can take advantage of these Services without using the Candidate Portal, for example, by calling, submitting an online form, or mailing a letter to Checkr to request such Services." (*Id.*).  Fong attests that Checkr users, like Hill, agree electronically to the TOS for use of the Candidate Portal on Checkr's website by clicking a box, specifying that "By checking this box, I agree to Checkr's Terms of Service (set forth above) . . ." (*Id* ).

       Checkr's system records the date, time and IP address of the user when they click the box agreeing to Checkr's TOS.  Fong attests that Hill agreed to the TOS containing the arbitration agreement and has produced an exhibit evidencing his access and agreement to the TOS on

9

September 26, 2023 by matching his name and an IP address. (*Id* at 22).

Notice of the arbitration agreement is found at the top of the first page of the TOS. It is written in all capital letters and reads:

> **IMPORTANT NOTICE: THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION AND CLASS ACTION WAIVER. IT AFFECTS YOUR LEGAL RIGHTS UNLESS YOU OPT OUT, AS DETAILED IN THE ARBITRATION AND CLASS ACTION WAIVER SECTION BELOW. PLEASE READ CAREFULLY.**

Later in the TOS it reiterates that the parties were agreeing to arbitration.

> PLEASE NOTE: SECTION 14 OF THIS AGREEMENT GOVERNS HOW DISAGREEMENTS AND CLAIMS BETWEEN YOU AND CHECKR CAN BE RESOLVED. THIS SECTION, WITH LIMITED EXCEPTION, REQUIRES YOU AND CHECKR TO SUBMIT CLAIMS AGAINST EACH OTHER TO BINDING AND FINAL ARBITRATION

The arbitration agreement reads that Checkr and party agreeing to the TOS mutually agree to the following:

> In exchange for the benefits of the speedy, economical, and impartial dispute resolution procedure of arbitration, You and Checkr mutually agree to give up our right to resolve disagreements in a court of law by a judge or jury, and, as described below, agree to binding and final arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 1, et seq. You and Checkr agree that this arbitration agreement is governed by the Federal Arbitration Act, and shall survive even after these Terms or any Services terminate.

Further on it reads:

> Other than the exceptions in Section 14.D, You and Checkr agree that any disagreement, claim, or controversy arising out of or relating in any way to these Terms (including its enforcement, breach, performance, interpretation, validity, or termination), or Your access to and/or use of the Services, or the provision of content, services, and/or technology on or through the Services (hereinafter, "Claims"), shall be resolved by final and binding arbitration to the fullest extent allowed by law.

Here, the Court finds the parties agreed to arbitrate their disputes. Although Hill claims not to have seen the TOS or was unaware that he was entering an agreement with Checkr, the unopposed evidence demonstrates that he did in fact access the Checkr site and clicked on the "I agree to the TOS button. Fong's Declaration provides that one cannot access the services of the Checkr Candiate Portal online unless one first agrees to the TOS, which includes the agreement to arbitrate as found on the Checkr website where it reads:

> By checking the box below and accessing the Services, you agree to be bound by these Terms and our Privacy Policy, as may be updated from time to time, ("Privacy Policy"), which is incorporated into these Terms by reference. IF YOU DO NOT AGREE TO THESE TERMS, YOU MAY NOT USE OR ACCESS OUR SITE.

(ECF 10-1 at 9).

Checkr undisputedly conducted background checks on Hill related to his applications for employment.

Hill in his Complaint at paragraphs 17-21 alleges he authorized the conducting of a background check by providing his name, address date of birth, and social security number which Checkr used to verify Hill's identity. Hill' declaration that he did not agree to the TOS is belied by the fact that all his personal identifiers were supplied to Checkr online in order to access his background check status. These include highly personal identifiers such as his date of birth and social security number and were supplied online via an IP address that Hill does not dispute is his. Hill does not allege that someone else had his personal information and accessed Checkr's online Candidate Portal. As such, Hill's conclusory personal declaration that he does not recall or simply that he did not agree to the TOS does not create a genuine issue of material fact in light of Checkr's electronic evidence to the contrary. "Plaintiff's own self-serving affidavit to the

11

contrary is insufficient to create a genuine dispute of material fact." *Reulbach*, 2021 WL 2581565, at *5 citing *Stephens v. Frisch's Big Boy Rests.*, 2020 WL 4754682, at *3 (S.D. Ohio 2020) ("Plaintiff's naked assertion that she did not sign the arbitration agreement, without more, is insufficient to raise a dispute of material fact regarding the validity of the arbitration agreement or whether she electronically acknowledged the arbitration agreement."), report and recommendation adopted, 2020 WL 4748578 (S.D. Ohio 2020); *Morgan v. United Healthcare Servs., Inc.,* 2013 WL 1828940, at *3 (S.D. Ohio 2013) ("In her affidavit, plaintiff ... indicates she does not 'believe' she submitted an electronic signature 'that agreed to arbitration.' Such conjecture is belied by the record and provides no basis to avoid arbitration ... To the extent plaintiff suggests she does not remember, this fails to create any issue as to whether the parties had a valid agreement to arbitrate."

Here, there is a clear offer of a mutually binding arbitration agreement via Checkr's TOS that was written in bold letters. In order to proceed to access the Candidate Portal, a party had to click the box affirming acceptance to the TOS which included the arbitration agreement. Hill's acceptance is found here based on the unrebutted declaration of Fong, supported by the electronic evidence that Hill provided his personal identifiers and clicked the agree box in order to access the Candidate Portal. Indeed, an "employee who signs a form ... indicating that he understands his obligations if he chooses not to participate in an arbitration program, fails to take the required action to opt out, and never provides any other notice to management that he intends to opt out, has 'demonstrated his agreement to be bound' by an arbitration agreement." *Uszak v. AT&T Mobility Services,* LLC, 658 Fed.Appx. 758, 763 (6th Cir. 2016). Hill did submit a letter asking to opt out of arbitration but it was filed outside the thirty day opt out limitation period.

Moreover, consideration is found where both parties agree to arbitrate their disputes.  See *Reulbach* 2021 WL 2581565, at *6 and *Dantz,* 123 Fed.Appx. at 708–09. See also *Robinson v. Mayfield Auto Grp., LLC*, 100 N.E.3d 978, 984 (Ohio Ct. App. 2017) ("[T]he parties' agreement to arbitrate all disputes serves as consideration ...").  Therefore, because all the elements having been met, the Court finds the parties agreed to final and binding arbitration.

Having determined the parties agreed to arbitrate their disputes, the remainder of Hill's challenges will be determined by the arbitrator.  The arbitration agreement reads in pertinent part:

> You and Checkr agree that this arbitration agreement is governed by the Federal Arbitration Act, and shall survive even after these Terms or any Services terminate.
>
> B. Claims Covered by Arbitration
>
> Other than the exceptions in Section 14.D, You and Checkr agree that any disagreement, claim, or controversy arising out of or relating in any way to these Terms (including its enforcement, breach, performance, interpretation, validity, or termination), or Your access to and/or use of the Services, or the provision of content, services, and/or technology on or through the Services (hereinafter, "Claims"), shall be resolved by final and binding arbitration to the fullest extent allowed by law.
>
> C. Delegation to Arbitrator
> ***If there is a disagreement about the arbitrability of any Claim (including questions about the scope, applicability, interpretation, validity, and enforceability of this arbitration agreement), You and Checkr agree that this threshold disagreement shall be delegated to the arbitrator (not a court)*** and that the arbitrator shall have initial authority to resolve such threshold disagreements. (Emphasis added).

(ECF 10-1 at 17-18).

Issues such as procedural and substantive unconscionability maybe delegated and in this case were delegated to the arbitrator per the above plain language of the arbitration agreement.

13

See *In re StockX Customer Data Sec. Breach Litig.,* 19 F.4th 873, 887 (6th Cir. 2021). Thus, "if a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator" and that delegation provision stands, "a court may not decide the arbitrability issue." *Id* at 880 quoting *Henry Schein, Inc. v. Archer & White Sales, Inc.* 586 U.S. 63, 69 (2019). Here, Hill does not challenge the agreement to delegate arbitrability issues to the arbitrator save for his general arguments on lack of assent already addressed by the Court. Thus, per the plain language of the arbitration clause delegating such matters to the arbitrator, the Court finds the parties agreed to delegate matters of arbitrability to the arbitrator.

Furthermore, there is no dispute that Fair Credit Reporting Act claims may be arbitrated. See *McMahan v. Byrider Sales of Indiana S, LLC,* No. 3:17-CV-00064-GNS, 2017 WL 4077013, at *4 (W.D. Ky. Sept. 14, 2017). ("There is no indication that Congress intended to preclude the arbitration of FCRA claims and courts have held that such claims are arbitrable.") See also *Yaroma v. Cashcall, Inc.,* 130 F.Supp.3d 1055, 1065-66 (E.D. Ky. 2015); *Liedtke v. Frank*, 437 F.Supp.2d 696, 700 (N.D. Ohio 2006).

As a result, the Court finds the FCRA claims are arbitrable.

Finally, the Court finds that a stay is warranted. In *Smith v. Spizzirri*, 601 U.S. 472 (2024) the Supreme Court considered Section 3 of the FAA, entitled "Stay of proceedings where issue therein referable to arbitration," which provides that, when any issue in a suit is subject to arbitration, the court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration." The *Spizzirri* panel announced: "Just as "shall" means "shall," "stay" means "stay." 601 U.S. at 476.

Thus, when granting a motion to compel arbitration, the appropriate disposition of the matter is a stay, not a dismissal.  However, the Court notes the additional guidance in the *Spizzirri* opinion at 478:   "District courts can, of course, adopt practices to minimize any administrative burden caused by the stays that § 3 requires."  The Court has no further involvement in the choice of the arbitrator nor in the conduct of the arbitration proceedings.  It is unknown how long those proceedings may take to reach their conclusion.  There is no justification for maintaining the captioned case in a state of suspension on the Court's docket. The Motion to Compel Arbitration is granted.  Pursuant to *Smith v. Spizzirri*, 601 U.S. 472 (2024), the above-captioned case is not dismissed but rather stayed and removed from the Court's active docket subject to re-opening upon written motion of either party.

**IT IS SO ORDERED.**

**DATE: 8/15/2025**

 **s/Christopher A. Boyko**
**CHRISTOPHER A. BOYKO**
**United States District Judge**